IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PETER & DEBORAH AMATO, <u>ET AL.</u>, | : | No.   06cv39 |
| | : | |
| Plaintiffs | : | Judge Jones |
| | : | |
| v | : | |
| | : | |
| KPMG LLP, <u>ET AL.</u>, | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM AND ORDER

June 13, 2006

## THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

We have a plethora of motions before us which will be addressed in this Memorandum and Order.  First, we have three Motions to Compel Arbitration and Stay All Proceedings, or Alternatively, for Additional Time to Respond to Complaint (docs. 7, 8, 10) filed by Defendants KPMG LLP ("KPMG"), Presidio Advisors LLC and Presidio Growth LLC (collectively, "Presidio"), and Deutsche Bank AG ("Deutsche Bank") and Deutsche Bank Securities, Inc. ("DBSI") (collectively "Deutsche Bank Defendants") on January 13, 2006.  Second, pending before the Court is a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (doc. 9)

filed by Defendant Sidley Austin Brown & Wood LLP[1] ("Sidley Austin") on January 13, 2006.  Finally, we have before us a Motion to Remand for Lack of Subject Matter Jurisdiction (doc. 23) filed by Plaintiffs on February 6, 2006.

For the reasons that follow, we will deny Plaintiffs' Motion to Remand, grant in part and deny in part Sidley Austin's Motion to Dismiss, order Plaintiff Mr. Chebalo to submit to arbitration his claims against the Deutsche Bank Defendants, and stay all further proceedings in this case against all Defendants pending the completion of the arbitration process between Plaintiff Mr. Chebalo and the Deutsche Bank Defendants in accordance with the arbitration clause contained in the Customer Agreement.  In addition, the Court will set a telephonic status conference for December 4, 2006, which will be initiated by Plaintiffs' counsel, advising the Court on the progress of the arbitration procedure.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY:

On or about October 28, 2005, Plaintiffs[2] filed a complaint against

---

[1] It has been indicated to the Court that as of January 1, 2006, the name of the firm changed from Sidley Austin Brown & Wood LLP to Sidley Austin LLP.  (Rec. Doc. 9 at 3 n.1).  We will refer to Sidley Austin LLP as Sidley Austin in this narrative.

[2] Plaintiffs in this action are Peter and Deborah Amato, Joseph and Donna Amato, Leonard and Lana Ross, and James Chebalo, individually, and as Executor of the Estate of Rosalie Chebalo (collectively "Plaintiffs").

2

Defendants[3] in the Court of Common Pleas of Luzerne County, Pennsylvania alleging various misconduct relating to Plaintiffs' participation in an investment strategy known as Offshore Portfolio Investment Strategy ("OPIS").  By stipulation of the parties, the time for Defendants to respond to Plaintiffs' complaint was extended to January 6, 2006.  On January 6, 2006, the Deutsche Bank Defendants, with the consent of all Defendants, removed the action to this Court.

Plaintiffs' complaint alleges that in 1998 they realized a significant capital gain from the sale of certain companies, including Keystone Automotive Warehouse.  (Compl. ¶¶ 22-25).  Plaintiffs are individuals who hoped to avoid tax liability by investing in a tax-advantaged investment strategy, OPIS, that was allegedly marketed to them by KPMG.  Id. ¶¶ 25, 47, 48.  Plaintiffs allege that they participated in the OPIS strategy after meeting with a representative of KPMG, who advised them that they could recognize significant tax benefits through their participation in OPIS.  Id. ¶ 25.  Subsequently, Plaintiffs claimed substantial tax losses on their tax returns.  Id. ¶ 13.  Plaintiff allege that the IRS and the Commonwealth of Pennsylvania later challenged such losses.  Id. ¶¶ 32, 99-101.

---

[3] Defendants in this action are KPMG LLP, Sidley Austin Brown & Wood LLP, Presidio Advisors LLC, Presidio Growth LLC, Deutsche Bank AG and Deutsche Bank Securities, Inc. (collectively "Defendants").

3

The crux of the allegations in the complaint is that the Deutsche Bank Defendants engaged in a scheme to induce wealthy and sophisticated persons, like Plaintiffs, to pursue the OPIS strategy when they knew or should have known that OPIS was an abusive tax shelter that would be disallowed by the IRS.  Id. ¶ 85.  As a result, Plaintiffs now claim that they were misled about the propriety and nature of the OPIS strategy and seek damages from not only KPMG, Sidley Austin, and Presidio, but also against the Deutsche Bank Defendants, which provided credit and account services to Plaintiffs.  Id. ¶¶ 85, 105-225.

Plaintiffs allege that "KPMG expressly represented to present plaintiffs that KPMG and the [Sidley Austin] law firm would independently provide opinion letters."  Id. ¶¶ 61, 108.  As a result, Plaintiffs "reasonably relied to their significant detriment on the independence of Brown & Wood in connection with entering into the OPIS transaction and in engaging Brown & Wood."  Id. ¶ 61.  Moreover, Plaintiffs allege in the complaint that Sidley Austin wrongfully issued alleged "independent" opinion letters to Plaintiffs that concluded it was "more likely than not" that the tax deductions generated by OPIS would be upheld if challenged by the IRS.  Id. ¶ 67.  Plaintiffs allege that Sidley Austin knew or should have known that OPIS was not "more likely than not" to be upheld by the IRS, since it based this opinion on facts that it knew or should have known were

4

not correct and in any event, since the transaction had no economic substance other than to reduce taxable income.  Id. ¶¶ 67, 153.  Plaintiffs assert that KPMG, acting as Sidley Austin's agent in this alleged fraudulent marketing endeavor, represented to Plaintiffs that the promised tax opinion of Sidley Austin was "independent."  Id. ¶ 154.  The Senate Subcommittee found the evidence suggested that Sidley Austin and KPMG were "close collaborators, rather than independent actors."  Id. ¶ 60.

Plaintiffs additionally allege that the Senate Subcommittee questioned Sidley Austin's compliance with American Bar Association Model Rule 1.5, which prohibits charging of unreasonable fees.  Id. ¶ 65.  Sidley Austin was paid at least $50,000 for each allegedly "independent" opinion letter and Plaintiffs allege that the letters were in fact canned creations.  Id. ¶¶ 64, 69.  Plaintiffs assert that Chief Judge Thomas F. Hogan of the United States District Court for the District of Columbia has already stated that Sidley Austin's tax shelter opinion letters have "little indication" that they are "independent opinion letters that reflect any sort of legal analysis, reasoned or otherwise.  In fact, when examined as a group, the letters appear to be nothing more than an orchestrated extension of KPMG's marketing machine."  Id. ¶ 69 (quoting United States v. KPMG LLP, 316 F. Supp. 2d 30, 40 (D.D.C. 2004)).

Plaintiffs' complaint alleges the following twenty causes of action: (1)

5

misrepresentation/fraud against KPMG; (2) negligent misrepresentation against KPMG; (3) breach of fiduciary duty against KPMG; (4) professional malpractice against KPMG; (5) consumer fraud against KPMG; (6) aiding and abetting fraud, aiding and abetting breaches of fiduciary duty against KPMG; (7) civil conspiracy against all Defendants; (8) misrepresentation/fraud against Sidley Austin; (9) negligent misrepresentation against Sidley Austin; (10) breach of fiduciary duty against Sidley Austin; (11) professional malpractice against Sidley Austin; (12) consumer fraud against Sidley Austin; (13) aiding and abetting fraud, aiding and abetting breaches of fiduciary duty; (14) misrepresentation against Deutsche Bank; (15) negligent misrepresentation against Deutsche Bank; (16) aiding and abetting fraud, aiding and abetting breaches of fiduciary duty against Deutsche Bank; (17) misrepresentation/fraud against Presidio; (18) negligent misrepresentation against Presidio; (19) consumer fraud against Presidio; and (20) aiding and abetting fraud, aiding and abetting breaches of fiduciary duties against Presidio.  Plaintiffs also seek punitive damages against all Defendants.

The Motions pending before the Court have been fully briefed and the Court heard oral argument on such Motions on May 24, 2006.

## DISCUSSION:

### A.    Sidley Austin's Motion to Dismiss

Defendant Sidley Austin filed a Motion to Dismiss this action pursuant to Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 12(b)(6), or, in the alternative, pursuant to Fed.R.Civ.P. 9(b).  Before elaborating upon Sidley Austin's Motion, we will provide the applicable standard of review for a motion to dismiss.  In considering a motion to dismiss, a court must accept the veracity of a plaintiff's allegations.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also White v. Napoleon, 897 F.2d 103, 106 (3d Cir. 1990).  In Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996), our Court of Appeals for the Third Circuit added that in considering a motion to dismiss based on a failure to state a claim argument, a court should "not inquire whether the plaintiffs will ultimately prevail, only whether they are entitled to offer evidence to support their claims."  Furthermore, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also District Council 47 v. Bradley, 795 F.2d7 310 (3d Cir. 1986).

We initially note that in considering Defendant Sidley Austin's Motion, we must construe the complaint in the light most favorable to Plaintiffs, take the allegations in the complaint as true, and draw all reasonable inferences that can be drawn from the pleading in Plaintiffs' favor.

7

### i.   Fraud, Negligent Misrepresentation, and Consumer Fraud Claims

In its Motion, Sidley Austin argues that Plaintiffs' claims for fraud,
negligent misrepresentation, and consumer fraud against it fail because Plaintiffs
have not and cannot plead reliance or a misrepresentation of past or present
material fact.  Sidley Austin asserts that Plaintiffs cannot allege that they relied
upon any communications by Sidley Austin in entering into the transaction because
Plaintiffs themselves submit that they never spoke to anyone from Sidley Austin.
Moreover, Sidley Austin maintains that Plaintiffs could not reasonably have relied
upon the substance of the promise made by KPMG as an agent of Sidley Austin,
that Sidley Austin, acting independently, would provide them with an opinion
letter.  In that regard, Sidley Austin contends that the alleged statements by KPMG
cannot satisfy the elements of justifiable reliance.

In response, Plaintiffs assert that they have stated viable fraud, negligent
misrepresentation, and consumer fraud claims.  Plaintiffs argue that a promise can
be the basis of a fraud claim under Pennsylvania law, "reliance" cannot be decided
on a Fed.R.Civ.P. 12(b)(6) motion, and a determination as to whether Plaintiffs had
personal knowledge of the alleged misrepresented facts is not susceptible to
resolution on a Fed.R.Civ.P. 12(b)(6) motion.

Sidley Austin accurately submits that Plaintiffs must plead in their fraud,

negligent misrepresentation, and consumer fraud claims that Sidley Austin made a misrepresentation of a past or present material fact and that Plaintiffs incurred damages by justifiably relying on those same misrepresentations.  See Krause v. Great Lakes Holdings, Inc., 563 A.2d 1182, 1187 (Pa. Super. Ct. 1989); GMH Assocs. v. Prudential Realty Group, 752 A.2d 889, 901 (Pa. Super. Ct. 2000); Gibbs v. Ernst, 647 A.2d 882, 889 (1994)(justifiable reliance is an element of fraud); Kramer v. Dunn, 749 A.2d 984, 991 (Pa. Super. Ct. 2000)(justifiable reliance is an element of negligent misrepresentation); Toy v. Metro. Life Ins. Co., 863 A.2d 1, 9 (Pa. Super. Ct. 2004)("The Courts of this Commonwealth have consistently held that, to establish a private right of action under the UTPCPL, a plaintiff must demonstrate that he/she detrimentally relied upon the deceptive practice of the defendant and that the plaintiff suffered harm as a result of this reliance.").

At this early stage of the litigation and taking the allegations in the complaint as true, as we must at this juncture, we do not agree with Sidley Austin that Plaintiffs do not, and cannot, allege either that a material misrepresentation of past or present fact was made, or that they relied upon such a misrepresentation.

Plaintiffs allege that Sidley Austin, through KPMG, promised Plaintiffs an independent "more likely than not" opinion letter.  Plaintiffs allege that Sidley

Austin failed to disclose that these opinions were not independent and that Sidley Austin made the promise to "fraudulently induce[] plaintiffs to enter into the OPIS transaction." (Compl. ¶¶ 153-54). In response, Sidley Austin argues that a promise to do something in the future, which promise is not kept, is not fraud. As the United States District Court for the Eastern District of Pennsylvania explained in Leonard A. Feinberg, Inc. v. Central Asia Capital Corp., 974 F. Supp. 822 (E.D. Pa. 1997), while fraud claims may not rest solely upon misrepresentations of future promises, "it is equally true that a cause of action for fraud can be predicated on future promises if the defendant knew at the time he made the promise that he would not carry it out." Id. at 843 (citing Killian v. McCulloch, 850 F. Supp. 1239, 1255 (E.D. Pa. 1994)). As such, Plaintiffs' allegations concerning the fact that Sidley Austin promised an independent opinion and that Sidley Austin knew the opinion was not in fact independent are not merely future promises that cannot be the basis of a fraud claim under Pennsylvania law.

In addition, Sidley Austin maintains that Plaintiffs cannot establish the requisite reliance to prove their fraud, negligent misrepresentation, and consumer fraud claims. In that regard, Sidley Austin argues that Plaintiffs could not "justifiably have believed both that KPMG was the agent for [Sidley Austin] and that [Sidley Austin] was independent of KPMG." (Sidley Austin Br. Supp. Mot.

10

Dismiss at 7).

We are in agreement with Plaintiffs that allegations concerning the fact that KPMG was the agent for Sidley Austin with respect to the making of the promise of the independent opinion letter does not as a matter of logic preclude Sidley Austin from exercising independent judgment in the provision of that opinion letter. Moreover, Plaintiffs allege in the complaint that they reasonably relied to their significant detriment on the independence of Sidley Austin in connection with entering into the OPIS transaction and in engaging Sidley Austin. "Neither [Sidley Austin] nor KPMG, both of which owed fiduciary duties to their clients (the present plaintiffs), disclosed the collaboration, although it was a material fact and they had a duty to do so. In fact, and to the contrary, KPMG expressly represented to present plaintiffs that KPMG and the law firm would independently provide opinion letters. Had plaintiffs known of the undisclosed collaboration between [Sidley Austin] and KPMG, they would not have entered into the OPIS transaction." (Compl. ¶ 61). We find that contrary to Sidley Austin's arguments, Plaintiffs' complaint sufficiently alleges reasonable reliance. See Compl. ¶¶ 153, 160, 178.[4]

---

[4] Sidley Austin appears to alternatively contend that the fraud, negligent misrepresentation, and consumer fraud claims must fail "because many if not all of the misrepresentations that Plaintiffs allege in the opinion letter were within the personal knowledge of Plaintiffs." (Sidley Austin Br. Supp. Mot. Dismiss at 8). We disagree with Sidley Austin's

Taking Plaintiffs allegations in the complaint as true, as we must at this juncture, Plaintiffs have stated fraud and negligent misrepresentation claims upon which relief can be granted.  Sidley Austin's Motion is accordingly denied to that extent.

We must now consider Sidley Austin's additional reason for which it argues Plaintiffs' consumer fraud claim fails, specifically because Plaintiffs did not enter into the transaction for personal, family, or household purposes.  Sidley Austin contends that Plaintiffs entered into the transaction to protect funds generated by the sale of a corporate entity that they owned, and by which they earned their livelihood.  Sidley Austin asserts that Plaintiffs were not acting as consumers, but instead as investors and that Pennsylvania courts have rejected claims by individuals under the Unfair Trade Practices and Consumer Protection Law ("UTPCPL") where the purchase was not made primarily for personal, family or household purchases.

In response, Plaintiffs argue that Sidley Austin's argument rests incorrectly on the type of product purchased, and not the purpose of the purchase, which

---

argument that because of the alleged misrepresentations, Plaintiffs had every opportunity to know whether or not they were true.  Moreover, Sidley Austin's argument that the misrepresentations that the law firm inserted into its approximately 56 page highly technical and allegedly expert legal opinion letter were so obvious that "Plaintiffs could not have read some of the alleged misrepresentations without immediately recognizing their falsity" is not persuasive to the Court as Sidley Austin was the Plaintiffs' attorney during the period in question.  Id.

controls.  Plaintiffs distinguish case law relied upon by Sidley Austin and assert that they purchased the tax shelters to lessen their personal, not business, tax liabilities.

We initially note that, as submitted by Plaintiffs, Pennsylvania's consumer fraud statute, the UTPCPL, provides that "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful . . . may bring a private action to recover actual damages[.]"  73 P.S. § 201-9.2(a).  Although Sidley Austin argues that when Plaintiffs purchased the alleged OPIS tax shelter they were acting as investors, not as consumers, and therefore the tax shelters were purchased primarily for business, not personal purposes, we reiterate that we are in agreement with Plaintiffs that Sidley Austin's argument incorrectly rests on the type of product purchased, as opposed to the purpose of the purchase.  In that regard, Plaintiffs citation to the Pennsylvania Commonwealth Court case of <u>Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators</u>, 574 A.2d 641 (Pa. Commw. Ct. 1990), is apt.  In <u>Valley Forge</u>, the Pennsylvania Commonwealth Court explained that:

> If a laundry business were to purchase a home-use model, department store dryer for the primary purpose of drying clothes for the laundry

13

> business, such a purchase would be primarily for a business purpose, despite the fact that the dryer may have been a typical 'consumer product.' On the other hand, if the parents of twelve growing children purchased an industrial washer and dryer from a business supplier to be used primarily to do the family's laundry, the purchase would be primarily for a family purpose and come within the ambit of 73 P.S. § 201-9.2, notwithstanding the fact that industrial washers and dryers generally might not be considered typical 'consumer products.'

Id. at 648.

While we agree with Plaintiffs that the cases relied upon by Sidley Austin are factually distinguishable from the case sub judice,[5] at this juncture we will consider Sidley Austin's citation to the Third Circuit Court of Appeals case of Algrant v. Evergreen Valley Nurseries Ltd. Pshp., 126 F.3d 178, 186-88 (3d Cir. 1997), for the proposition that investment securities are not "goods" for purposes of the UTPCPL. In Algrant, the plaintiffs alleged that the fraud was in the valuation fixed by the issuer of the investment securities themselves and

---

[5] In David Jeffrey Ltd. v. Lucente, 7 Pa. D. & C.4th 558 (Ct. Com. Pl. 1990), the plaintiff was a business and not an individual. The business brought a UTPCPL claim contending the defendants fraudulently represented the extent of the coverage provided under the insurance policy they sold to plaintiff and the trial court granted nonsuit on the UTPCPL claim because there was "no evidence to support plaintiff's contention that the insurance coverage was for anything but business purposes." Id. at 562. Similarly, in Lal v. Ameriquest Mortg. Co., 858 A.2d 119 (Pa. Super. Ct. 2004), the plaintiff was a business partnership, not an individual, that purchased investment land for business, not personal, purposes. In McShane v. Recordex Acquisition Corp., 2003 WL 22805233 (Ct. Com. Pl. 2003), the purchase at issue was of medical records for use in ongoing litigation, which is not a personal, family or household occurrence, but is instead a public and/or commercial event. Finally, in Shulick v. DeGroat, 2005 WL 1384574 (Ct. Com. Pl. 2005), the purchase in question was of a retirement plan "developed for the workplace" and not purchased primarily for personal, family or household benefits.

misrepresentations the issuer made concerning the securities.  The Third Circuit

explained that only one trial court, in addition to the district court in the <u>Algrant</u>

case, has held that the UTPCPL does not cover the sale of investment securities.

<u>Id.</u> at 187.  In addition, the Third Circuit stated that Pennsylvania cases which hold

that the UTPCPL covers the purchase of securities also deal specifically with the

transaction, and not with the securities themselves.  <u>Id.</u>

　　　　As previously noted, this case concerns individuals who hoped to avoid

personal tax liability by investing in a tax-advantaged investment strategy, OPIS,

that was allegedly marketed to them by KPMG. (Compl. ¶¶ 25, 47, 48).  The crux

of the allegations in the complaint is that the Deutsche Bank Defendants engaged

in a scheme to induce wealthy and sophisticated persons, like Plaintiffs, to pursue

the OPIS strategy when they knew or should have known that OPIS was an abusive

tax shelter that would be disallowed by the IRS.  <u>Id.</u> ¶ 85.  As a result, Plaintiffs

now claim that they were misled about the propriety and nature of the OPIS

strategy and seek damages from not only KPMG, Sidley Austin, and Presidio, but

also against the Deutsche Bank Defendants, which provided credit and account

services to Plaintiffs.  <u>Id.</u> ¶¶ 85, 105-225.  Accordingly, we find that the factual

circumstances of this case are distinguishable from those in <u>Algrant</u>, which, as

noted, at least in part concerned fraud allegations in the valuation fixed by the

issuer of investment securities themselves.

Additionally, we note that Plaintiffs are individuals, and not businesses. Although Sidley Austin argues that Plaintiffs entered into the transaction to avoid paying taxes on gain from the sale of the business that they owned and by which they earned their livelihood, Plaintiffs purchased the alleged tax shelters to lessen their personal, as opposed to their business, tax liabilities. While we express no opinion as to the ultimate viability of Plaintiffs' consumer fraud claims, we find that taking all of Plaintiffs' allegations in the complaint as true, Plaintiffs have stated consumer fraud claims upon which relief can be granted.

## ii.     Breach of Fiduciary Duty Claims

In the Motion, Sidley Austin argues that Plaintiffs' claim for breach of fiduciary duty fails because Sidley Austin did not stand in a fiduciary relationship to Plaintiffs at the time it entered into the transaction. Sidley Austin contends that Plaintiffs did not seek and did not obtain legal advice from it before the OPIS transaction, thereby precluding the existence of an attorney-client, and hence fiduciary, relationship. In response, Plaintiffs assert that its breach of fiduciary duty claim is not limited to events before the consummation of the OPIS transaction. Plaintiffs maintain that part of their claim includes excessive and inappropriate fees charged by Sidley Austin, as well the issuance of opinion letters

to Plaintiffs which Plaintiffs allege Sidley Austin knew or should have known in the exercise of reasonable professional care were not correct.  (Compl. ¶¶ 167, 171).

In Count X of the complaint, Plaintiffs assert a breach of fiduciary claim against Sidley Austin in which they allege that Sidley Austin was employed in a fiduciary capacity by Plaintiffs and owed Plaintiffs the duties of a fiduciary. Plaintiffs allege that Sidley Austin owed Plaintiffs fiduciary duties of care and loyalty and that Sidley Austin "negligently or intentionally failed to act in good faith and solely for the benefit of plaintiffs in all matters for which Sidley Austin was employed."  (Compl. ¶¶ 163-64).  Plaintiffs allege that they suffered significant injury from Sidley Austin's actions, which were designed to benefit itself and which were detrimental to Plaintiffs.  Moreover, Plaintiffs allege that Sidley Austin's actions "reflect a series of actions in which Sidley Austin failed to act for plaintiffs' benefit but acted, instead, for its own (financial) benefit, was a real factor in bringing about plaintiffs' injuries.  Sidley Austin's breaches of its fiduciary obligations were a proximate cause of damage to plaintiffs."  Id. ¶ 166. Finally, Plaintiffs assert that Sidley Austin also breached its fiduciary duties by charging excessive and inappropriate fees to Plaintiffs in connection with the OPIS transaction.  Id. ¶ 167.

17

A careful review of Plaintiffs' complaint reveals that Sidley Austin has read Plaintiffs' allegations too narrowly.  We find that as Plaintiffs assert, they have not limited their claim to events that transpired before the consummation of the OPIS transaction, evidenced at least in part by Plaintiffs' allegations concerning "excessive and inappropriate fees" charged by Sidley Austin.  Although Sidley Austin argues that Plaintiffs have not alleged any damages proximately caused by events occurring after their entry into the transaction and that Plaintiffs have asserted conclusory allegations of damages, we disagree.  Plaintiffs have alleged that Sidley Austin's actions were a real factor in bringing about Plaintiffs' injuries and that its breaches of fiduciary obligations were a proximate cause of damages to Plaintiffs.  In addition, Plaintiffs have listed the following specific categories of damages which they seek: compensatory damages; lost profits; punitive damages; restitution and disgorgement of profits; recoupment of professional and other fees paid to Sidley Austin; interest including pre-judgment interest and recoupment of interest paid to the IRS;[6] and other relief deemed just and proper by the Court.

---

[6] We agree with Sidley Austin that courts have repeatedly disallowed damages based on the payment of back taxes, including the payment of interest.  See, e.g., Rosenthal v. Klein, 1989 U.S. Dist. LEXIS 8566 at *3 (E.D. Pa. 1989)(in claim based on purchase of partnership interest in tax shelter, lost tax benefits were not correct measure of damages); DCD Programs, Ltd. v. Leighton, 90 F.3d 1442, 1451-52 (9th Cir. 1996)(back taxes and interest paid to IRS are not recoverable damages); Gaslow v. KPMG LLP, 797 N.Y.S.2d 472, 473 (N.Y. App. Div. 2005)("Defendants' alleged inducement of plaintiff to invest in an Offshore Portfolio Investment Strategy (OPIS) that the IRS later determined to be illegal does not warrant recovery for the payment of taxes and interest to the taxing authorities.").

Moreover, Plaintiffs need not specifically plead how the alleged damages at issue would have been avoided had Sidley Austin conducted itself differently after Plaintiffs entered the transaction in which Sidley Austin's fiduciary obligations allegedly arose.

Accordingly, we find that Plaintiffs have stated a breach of fiduciary claim against Sidley Austin upon which relief can be granted in Count X of the complaint.

### iii.   __Professional Malpractice Claims__

In the Motion, Sidley Austin argues that Plaintiffs' claim for professional malpractice fails because Sidley Austin did not cause Plaintiffs' damages in its professional capacity.  In that regard, Sidley Austin maintains that the attorney-client relationship had not been established as of the time Plaintiffs entered into the OPIS transaction and that Plaintiffs' payment of back taxes was not caused by Sidley Austin's malpractice.

We initially note that under Pennsylvania law, a plaintiff must prove the following elements by a preponderance of the evidence to establish a cause of

---

Plaintiffs concede in their submissions that their prayer for relief does not mention the award of back taxes.  (Pls.' Br. Opp. Sidley Austin's Mot. Dismiss at 11).  To the extent that Plaintiffs seek the "recoupment of interest paid to the IRS" in their prayer for relief, such damages are inappropriate and are not a proper measure of damages.  Accordingly, Plaintiffs' claims for the recoupment of interest paid to the IRS in its complaint will be dismissed.

action for legal malpractice: "(1) the employment of the attorney or other basis for duty; (2) the failure of the attorney to exercise ordinary skill and knowledge; and (3) that such negligence was the proximate cause of the damage to the plaintiff." Thompson v. Glenmede Trust Co., 1996 U.S. Dist. LEXIS 16248 at *13-14 (E.D. Pa. 1996)(quoting Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)).

Count XI of Plaintiffs' complaint asserts a professional malpractice claim against Sidley Austin in which Plaintiffs allege that they engaged Sidley Austin as their professional attorneys and that the engagement create a duty in Sidley Austin toward Plaintiffs.  In that regard, Plaintiffs allege that "Prior to its engagement by plaintiffs, as already described, Sidley Austin committed various frauds and negligent and other misrepresentations against plaintiffs, including its actions in inducing plaintiffs to invest in OPIS.  During the course of its engagement as plaintiffs' professional attorneys, Sidley Austin failed to exercise ordinary skill and knowledge.  It was impeded by a conflict of interest between its role as participant as a promoter of the OPIS tax shelter and its role in providing a supposedly 'independent' opinion letter to plaintiffs."  (Compl. ¶¶ 169-70).  Plaintiffs further allege that among other things, Sidley Austin failed to exercise ordinary skill and knowledge in preparing its opinion letters and that the law firm knew or should have known that the factual bases behind its opinion were not correct.  "Among

other things, Sidley Austin failed to exercise the skill and knowledge of an expert in tax planning strategies, a standard to which it held itself out to plaintiffs." Id. ¶ 173.  Plaintiffs assert that each action delineated in the complaint and taken by Sidley Austin was negligent and proximately caused actual damage and losses to Plaintiffs.  Id. ¶ 175.

Again, we find that Sidley Austin has read Plaintiffs' complaint too narrowly and find that Plaintiffs' professional malpractice claim against Sidley Austin seeks damages for events following the OPIS transaction.  Although Plaintiffs admit that they entered into the OPIS transaction prior to their engagement of Sidley Austin, Plaintiffs' complaint reflects that it is the events that occurred during the course of the engagement with Sidley Austin that are subject to Plaintiffs' professional malpractice claims.  See Compl. ¶ 170 ("During the course of its engagement as plaintiffs' professional attorneys, Sidley Austin failed to exercise ordinary skill and knowledge . . . ).[7]  Taking all of Plaintiffs' professional

---

[7] In Plaintiffs' professional malpractice claim against Sidley Austin, Count XI of the complaint, Plaintiffs request the same categories of damages as we previously noted with respect to their breach of fiduciary duty claim in Count X of the complaint.  We find that Plaintiffs have sufficiently alleged that they sustained damages proximately caused by events during the course of Sidley Austin's representation of Plaintiffs.

In addition, and as noted, Plaintiffs concede that their prayer for relief does not mention the award of back taxes.  (Pls.' Br. Opp. Sidley Austin's Mot. Dismiss at 11).  As previously explained, to the extent that Plaintiffs seek the "recoupment of interest paid to the IRS" in their prayer for relief, such damages are inappropriate and are not a proper measure of damages. Plaintiffs' claim for the recoupment of interest paid to the IRS will therefore be dismissed.

malpractice allegations as true, as we must at this juncture, we find that Plaintiffs have stated a professional malpractice claim against Sidley Austin upon which relief can be granted.

### iv.    Aiding and Abetting Claims

In the Motion, Sidley Austin argues that Plaintiffs' claim for aiding and abetting fails because Pennsylvania does not recognize a claim for aiding and abetting fraud and Plaintiffs have not alleged that Sidley Austin's aiding and abetting was the cause of their damages.  In that regard, Sidley Austin maintains that Plaintiffs have failed to allege that any assistance or encouragement by the law firm caused damage to Plaintiffs and that Plaintiffs did not have any communication with Sidley Austin before they entered the transaction.

In response, Plaintiffs assert that they have stated viable aiding and abetting claims and that Pennsylvania law does not reject aiding and abetting liability for fraud.  In addition, Plaintiffs maintain that they have adequately alleged that Sidley Austin's aiding and abetting was a cause of their damage.

In Count XIII of the complaint, Plaintiffs have asserted claims against Sidley Austin for aiding and abetting fraud and breaches of fiduciary duty.  Plaintiffs allege that Sidley Austin aiding and abetted a fraud perpetuated against Plaintiffs by KPMG and Presidio.  "Specifically, Sidley Austin knowingly permitted and

encouraged its name to be invoked by KPMG as an independent and reliable source that would provide corroboration for the bona fide nature of OPIS.  Sidley Austin knew that KPMG and Presidio owed fiduciary duties to plaintiffs.  Sidley Austin also lent credence to KPMG's opinion letter and other representations about OPIS by reiterating those conclusions and representations in its own, supposedly independent opinion letter.  However, Sidley Austin knew that KPMG and Presidio were aware that Sidley Austin was not independent."  (Compl. ¶ 184).  In addition, Plaintiffs allege that Sidley Austin "knowingly and willfully provided substantial assistance and encouragement to KPMG and Presidio in connection with their fraudulent activities and their breaches of fiduciary duties."  Id. ¶ 185.  Finally, Plaintiffs assert that Sidley Austin's actions in aiding and abetting such breaches of fiduciary duties and fraudulent activities proximately caused damage to Plaintiffs. Id. ¶ 186.

It appears that both parties concede that the Pennsylvania Supreme Court has not made a direct pronouncement concerning whether Pennsylvania recognizes a private cause of action for aiding and abetting fraud.  Therefore, we must predict how the Pennsylvania Supreme Court would rule on the issue if it were presented to them.  Carrasquilla v. Mazda Motor Corp., 197 F. Supp. 2d 169, 172 (M.D. Pa. 2002)(citing Nationwide Mut. Ins. Co. v. Buffetta, 230 F.3d 634, 637 (3d Cir.

2000)).  The following standard applies to a federal court that must predict how a

state's highest court would rule on an issue:

> [T]he federal court must look to decisions of any intermediate state
> appellate court, other federal courts interpreting the law of the state,
> and other state supreme courts that have decided the issue, as well as
> analogous decisions, dicta, scholarly works, and any other reliable
> data which would tend to show convincingly how the state's highest
> court would rule.

Id. (quoting Walsh, 63 F. Supp. 2d at 551).  In considering these factors,

intermediate state court appellate decisions should be given "significant weight" by

the federal court, if there is no indication that the state's highest court would rule

otherwise.  Id.; see also Polselli v. Nationwide Mut. Fire Ins. Co., 126 F.3d 524,

528 n.3 (3d Cir. 1997).

     In their submission, Plaintiffs state that having not been adopted by the

Pennsylvania Supreme Court "is qualitatively different" from having been rejected

by the Pennsylvania Supreme Court and cite to Thompson v. Glenmede Trust Co.,

1996 WL 529696 at *2 n.6 (E.D. Pa. Sept. 16, 1996), a 1996 United States District

Court for the Eastern District of Pennsylvania case in which the court refused to

dismiss an aiding and abetting fraud claim noting it to be an "unsettled question of

law[.]"  In Thompson, the court held that an aiding and abetting fraud claim may

exist under Pennsylvania law, and thus did not dismiss such a claim.  Id.

     Although Plaintiffs accurately submit that Sidley Austin did not point to any

24

Third Circuit Court of Appeals, Pennsylvania Supreme Court, or intermediate state appellate case holding that claims for aiding and abetting fraud are not viable under Pennsylvania law, nor did the Court locate any such case, we are in agreement with Sidley Austin that the majority of Pennsylvania federal courts considering this issue have found that Pennsylvania law does not allow for claims of aiding and abetting fraud and have declined to expand Pennsylvania law to include such claims.  WM High Yield Fund v. O'Hanlon, 2005 U.S. Dist. LEXIS 12064 at *49-50 (E.D. Pa. May 13, 2005)(Despite the plaintiffs' argument that their aiding and abetting fraud claim should go forward because the claim is substantially similar to a cause of action for aiding and abetting a breach of fiduciary duty, which has been recognized by several Pennsylvania lower courts, the court "follow[ed] the lead of the majority of other courts in this district, in declining to expand Pennsylvania law, and [held] that the Pennsylvania Supreme Court would not permit such an action."); Waslow v. Grant Thornton LLP (In re Jack Greenberg, Inc.), 240 B.R. 486 (Bankr. E.D. Pa. 1999); Klein v. Boyd, 1996 U.S. Dist. LEXIS 17153 (E.D. Pa. 1996)("The Pennsylvania Supreme Court has never recognized a cause of action for aiding and abetting common law fraud."), aff'd in part and rev'd in part, 1998 U.S. App. LEXIS 2004 (3d Cir. 1998), rehearing en banc granted and judgment vacated, 1998 U.S. App. LEXIS 4121 (Mar. 9, 1998); S. Kane & Son

<u>Profit Sharing Trust v. Marine Midland Bank</u>, 1996 U.S. Dist. LEXIS 8023 at *30 (E.D. Pa. June 13, 1996)(granting summary judgment on claim for aiding and abetting since "Pennsylvania has not adopted this cause of action.").  We will accordingly follow the majority of Pennsylvania federal courts that have considered this issue and find that Pennsylvania law does not allow for claims of aiding and abetting fraud.  Sidley Austin's Motion is granted to the extent that Plaintiffs' aiding and abetting fraud claims will be dismissed.

Plaintiffs accurately submit, however, that Sidley Austin's Motion does not address the portion of Count XIII that asserts an aiding and abetting breach of fiduciary claim against Sidley Austin.  Claims for aiding and abetting a breach of fiduciary duty have been recognized by several Pennsylvania lower courts, including the Pennsylvania Commonwealth Court in <u>Koken v. Steinberg</u>, 825 A.2d 723, 731 (Pa. Commw. Ct. 2003), as submitted by Plaintiffs.[8]  <u>See also</u> <u>WM High Yield Fund</u>, 2005 U.S. Dist. LEXIS 12064 at *49-50 (lists cases that indicate Pennsylvania lower courts recognize claims for aiding and abetting a breach of fiduciary duty).  Even assuming <u>arguendo</u> that we were to construe Sidley Austin's

---

[8] We note that there are four elements to a claim of aiding and abetting a breach of fiduciary duty: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) knowing participation in that breach by the defendant; and (4) damages proximately caused by the breach.  <u>See</u> <u>Damage Recovery Sys. v. Tucker</u>, 2004 U.S. Dist. LEXIS 19821 at *14-15 (D. Del. 2004)(citing <u>Malpiede v. Townson</u>, 780 A.2d 1075, 1096 (Del. 2001)).

submissions as addressing Plaintiffs' aiding and abetting a breach of fiduciary duty claim in Count XIII of the complaint, we find that taking all of Plaintiffs' allegations as true, as we must, that Plaintiffs have stated such a claim upon which relief can be granted based upon the Plaintiffs' following allegations: that Sidley Austin, a fiduciary, knowingly permitted and encouraged its name to be invoked by KPMG as an independent and reliable source that would provide corroboration for the bona fide nature of OPIS; that Sidley Austin was cognizant that KPMG and Presidio owed fiduciary duties to Plaintiffs; that Sidley Austin lent credence to KPMG's opinion letter and other representations about OPIS by reiterating such conclusions in its own allegedly independent opinion letter; that Sidley Austin knowingly and willfully provided substantial assistance and encouragement to KPMG and Presidio in connection with their alleged breaches of fiduciary duties; and that Sidley Austin's actions in aiding and abetting such breaches of fiduciary duties proximately caused damage to Plaintiffs.

### v.   Civil Conspiracy Claims

Sidley Austin argues in the Motion that Plaintiffs' claim for civil conspiracy fails because they have not and cannot plead intent to injure. Sidley Austin maintains that Pennsylvania courts require more than allegations of apparently purposeless harm. Moreover, Sidley Austin asserts that Plaintiffs' claim for civil

conspiracy fails as the sole purpose of the conspiracy cannot have been to injure Plaintiffs.

In response, Plaintiffs assert that the civil conspiracy claim pleads the requisite intent to injure.  In that regard, Plaintiffs submit that Sidley Austin has quoted Plaintiffs' allegation concerning Sidley Austin acting for its own financial benefit out of context and that whether Sidley Austin was or was not acting "for its own (financial) benefit" cannot, as a matter of law, defeat Plaintiffs' conspiracy claim.  (Pls.' Br. Opp. Sidley Austin's Mot. Dismiss at 18-19).

To state a cause of action for civil conspiracy, a plaintiff must allege that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means.  Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979); Skipworth by Williams v. Lead Indus. Ass'n, 690 A.2d 169, 174 (Pa. 1997); WM High Yield Fund, 2005 U.S. Dist. LEXIS 12064 at *45.  In addition, a claim for civil conspiracy requires "[p]roof of malice, i.e., an intent to injure."  Grose v. P&G Paper Prods., 866 A.2d 437, 440-41 (Pa. Super. Ct. 2005); Skipworth by Williams, 690 A.2d at 174.  As accurately submitted by the parties, Thompson has been consistently interpreted as requiring that the sole purpose of the conspiracy be an intent to injure or to cause harm to the party who has been injured.  WM High Yield Fund, 2005 U.S. Dist. LEXIS 12064 at *46-49;

<u>Becker v. Chicago Title Ins. Co.</u>, 2004 WL 228672 at *13 (E.D. Pa. Feb. 4, 2004).

Sidley Austin directs the Court's attention to an allegation in the complaint stating that Sidley Austin's actions reflect that it failed to act for Plaintiffs' benefit but acted, instead, "for its own (financial) benefit[.]" (Compl. ¶ 166). Sidley Austin then submits that the above-referenced allegation goes to Sidley Austin's purpose in allegedly participating in the transaction and it indicates that Sidley Austin participated in the alleged conspiracy to benefit itself financially, rather than with the requisite intent to harm or injure Plaintiffs.

First, we are in agreement with Plaintiffs that Sidley Austin did not pull the allegation that it acted "for its own (financial) benefit" out of Plaintiffs' civil conspiracy claim, but rather it appears in Plaintiffs' breach of fiduciary duty claim against Sidley Austin. A technical reading of the complaint reveals that although Plaintiffs incorporated by reference all "foregoing allegations" into their civil conspiracy claim, Count VII of the complaint, they did not incorporate by reference their breach of fiduciary claim, Count X of the complaint, as such allegations appear subsequent in time to the civil conspiracy count. Accordingly, Plaintiffs' allegation concerning Sidley Austin acting "for its own (financial) benefit" was not incorporated by reference into the civil conspiracy claim against Sidley Austin. Moreover, we find that Plaintiffs' civil conspiracy allegations that

appear in Count VII of the complaint state a cause of action for civil conspiracy upon which relief can be granted as they fulfill the requisite aforereferenced elements.

### vi.   Fraud Claims

Sidley Austin alternatively argues that Plaintiffs should be required to amend the complaint in order to plead their fraud claim with greater specificity pursuant to Fed.R.Civ.P. 9(b).[9]  Sidley Austin maintains that Plaintiffs never allege with specificity when they met with representatives from KPMG, when the misrepresentations alleged were made to them, when Plaintiffs entered into the transaction in question, when Plaintiffs filed their tax returns, or what Plaintiffs filed on their tax returns.

We find that Sidley Austin's argument lacks merit.  As now pled and for the reasons cited herein, Plaintiffs' 225 paragraph complaint with attachments of the full-text reports of the Senate Subcommittee contain sufficient specificity to put Sidley Austin on notice of the conduct of which it is charged.  We find that Fed.R.Civ.P. 9(b)'s pleading requirements have been satisfied.

To summarize, Defendant Sidley Austin's Motion is granted only with respect to Plaintiffs' request for recoupment of interest paid to the IRS and

---

[9] Federal Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

Plaintiffs' aiding and abetting fraud claims.  Sidley Austin's Motion is denied in all other respects.

B.     **Plaintiffs' Motion to Remand**

In the Motion, Plaintiffs argue that the case sub judice should be remanded to the Court of Common Pleas of Luzerne County as this Court lacks subject matter jurisdiction.  Plaintiffs assert that they bring solely state law claims against Defendants and that complete diversity is lacking, as is federal question jurisdiction.  "No defendant contends otherwise.  No defendant removed this case within the 30-day window created by 28 U.S.C. § 1446(b) . . . The Deutsche Bank Defendants invoke a single ground for removal, namely, 9 U.S.C. § 205, alleging that this action 'relates to an arbitration agreement falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards' ('the Convention')." (Pls.' Br. Supp. Mot. Remand at 2-3).  Plaintiffs maintain that this matter must be remanded to state court as it does not fall under the Convention.

Deutsche Bank Defendants' responsive submissions, to which Presidio and KPMG join, assert that the action was removed pursuant to 9 U.S.C. § 205 because it "relates to" an arbitration agreement falling under the Convention.  Defendants contend that removal is proper under the Convention because Plaintiff Mr. Chebalo's claims fall under a Customer Agreement that he signed, thereby binding

himself to an arbitration clause that requires him to arbitration this dispute under the National Association of Securities Dealers, Inc. ("NASD") rules.  Defendants argue that the arbitration agreement falls under the Convention because the relationship between Plaintiffs and Defendants involved property located abroad, envisaged performance abroad, and had a reasonable relationship to a foreign state.

District courts have original jurisdiction over any "action or proceeding falling under the Convention[.]"[10] Removal from state court is accordingly appropriate whenever "the subject matter of an action or proceeding pending in a state court relates to an arbitration agreement or award falling under the Convention."  9 U.S.C. § 205.  In that regard, we note that this action was removed pursuant to 9 U.S.C. § 205, which provides, in pertinent part, as follows:

> Where the subject matter of an action or proceeding pending in a State court *relates to an arbitration agreement or award falling under the Convention*, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending.

9 U.S.C. § 205 (emphasis added).

---

[10] "An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States.  The district courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy." 9 U.S.C. § 203.

As the Deutsche Bank Defendants aptly submit, the standard for demonstrating removal jurisdiction under the Convention is a lenient one.  As the Fifth Circuit Court of Appeals has explained:

> whenever an arbitration agreement falling under the Convention could conceivably affect the outcome of the plaintiff's case, the agreement 'relates to' the plaintiff's suit.  Thus, the district court will have jurisdiction under § 205 over just about any suit in which a defendant contends that an arbitration clause falling under the Convention provides a defense.  As long as the defendant's assertion is not completely absurd or impossible, it is at least conceivable that the arbitration clause will impact the disposition of the case.  This is all that is required to meet the low bar of 'relates to.'

Beiser v. Weyler, 284 F.3d 665, 669 (5th Cir. 2002).  The phrase "'relates to' generally conveys a sense of breadth."  Id. (citing Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97 (1983)).  Moreover, this "easy" removal standard differs from the general rule of strict construction of statutes conferring removal jurisdiction.  As the Fifth Circuit has also stated,

> [i]n allowing removal whenever the arbitration clause could conceivable impact the disposition of the case, we make it easy, not hard, for defendants to remove.  But we conclude that easy removal is exactly what Congress intended in § 205.

Beiser, 284 F.3d at 674.

Against that backdrop, we note that Plaintiffs seek remand of the case sub judice on the ground that the arbitration agreement at issue is not a "foreign" arbitration agreement and accordingly does not fall under the Convention.

Plaintiffs argue that a relationship with a foreign corporation cannot override the "repeated statements in the Customer's Agreement that it will be enforced under the laws of the state of New York."  (Pls.' Br. Supp. Mot. Remand at 3, 5).  We are in agreement with Defendants that such an argument contradicts the express language of the Convention, which provides that an arbitration agreement falls under the Convention where the "relationship [out of which the agreement arises] involves property located abroad, envisages performance or enforcement abroad or has some reasonable relation with one or more foreign states."  See 9 U.S.C. § 202;[11] Freudensprung v. Offshore Technical Servs., Inc., 379 F.3d 327, 340 (5th Cir. 2004) (the Convention applies to an arbitration agreement between two United States citizens "provided that there is a 'reasonable relation' between the parties' commercial relationship and some 'important foreign element.'"); Lander Co. v. MMP Investments, Inc., 107 F.3d 476 (7th Cir. 1997) (Convention applied to arbitration agreement between two United States companies where only link to

---

[11] Section 202 of Title 9 of the United States Code, provides in pertinent part, as follows:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title [9 U.S.C. § 2], falls under the Convention.  An agreement or award arising out of such relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

34

foreign nation was that one party to agreement would be distributing United States manufactured products in Poland); Beiser, 284 F.3d at 666-69.  For the reasons that follow, we find that the relationship out of which the Customer Agreement arose involved property located abroad, envisaged performance in a foreign state, and otherwise related to a foreign state pursuant to 9 U.S.C. § 202.

We must first determine whether the parties' commercial relationship involved property located abroad under 9 U.S.C. § 202.  To execute the alleged OPIS strategy, Plaintiffs purchased certain Deutsche Bank AG securities and the terms of such securities, which Plaintiff Mr. Chebalo confirmed in writing, required the resale of Deutsche Bank AG stock on one of two German exchanges, the Frankfurt Stock Exchange or Xetra, a German electronic exchange.  (Rec. Doc. 27, Ex. A).  Moreover, as submitted by the Deutsche Bank Defendants, Mr. Chebalo and the other Plaintiffs acknowledged in writing that the "Transactions" included not only the purchase of Deutsche Bank AG stock, which was to be effected through his DBSI account, but also a loan made by Deutsche Bank AG. Id. at Ex. C.  We accordingly find that the relationship between the parties clearly involved property located abroad.

With regard to whether the parties' commercial relationship envisaged performance abroad pursuant to 9 U.S.C. § 202, the relevant jurisdictional inquiry

is not whether an arbitration agreement itself envisages performance abroad, but whether the *relationship* out of which the agreement arose envisages performance abroad.  See 9 U.S.C. § 202.  Although Plaintiffs seek to focus the Court on the choice of law clause in the Customer Agreement, entitled "Place of Performance – Governing Law," which provides that the enforcement of the Customer's Agreement is governed by New York law and that DBSI would perform its services in New York, we find that the parties envisaged that certain steps in Plaintiffs' OPIS investment strategy would involve performance abroad.  Consider, in that regard, that Mr. Chebalo signed a trade confirmation for the purchase of a call option which identifies "Deutsche Bank AG acting through its Frankfurt branch" as the counterparty.  In addition, the Confirmation provides for notice to be given to Deutsche Bank AG in Frankfurt, Germany, calls for payments to be directed to Deutsche Bank AG in Frankfurt, Germany, and requires the resale of the shares of common stock of Deutsche Bank AG only on German stock exchanges.  (Rec. Doc. 27, Ex. A).  Moreover, Plaintiffs signed agreements stating in pertinent part that they agree to resell the securities only through the Frankfurt Stock Exchange in a transaction complying with Rule 904 under the Securities Act. Id.; see also Rec. Doc. 27 at Ex. C.

We find that Plaintiffs' reliance upon the choice of law clause in the

36

Customer Agreement focuses the Court far too narrowly on a single provision of one agreement, as opposed to the whole commercial relationship between the parties. We are in agreement with Defendants that such a narrow focus cannot defeat jurisdiction under the Convention, which directs a court to analyze the totality of the commercial relationship out of which the Customer Agreement arose.

We must now consider whether the commercial relationship between the parties had a reasonable relationship to a foreign state. More specifically, in ascertaining whether Plaintiffs' commercial relationship with Deutsche Bank Defendants bears some "reasonable relation" to a foreign state, Germany, it is notable that Plaintiffs' OPIS strategy involved loans from Deutsche Bank AG and trading in foreign markets. Moreover, in the Customer Agreement, Mr. Chebalo agreed to arbitrate with "you," which is a term defined to include, among other things, "affiliates" and "affiliates of Deutsche Bank" is defined to include Deutsche Bank AG, a German corporation. (Rec. Doc. 27, Ex. B).

Although Plaintiffs argue that their participation in the OPIS Strategy was purely a domestic affair, they appear to gloss over the fact that the execution of each such strategy necessarily involved several foreign participants. (Compl. ¶¶ 39-40; Compl. at Ex. C). Exhibit C to Plaintiffs' complaint, which the complaint

incorporates by reference, is the opinion provided by Defendant KPMG to Plaintiff

Mr. Amato and which Plaintiffs allege is representative of the opinion letters

received by all Plaintiffs.  (Compl. ¶ 37).  The opinion letter provides as follows in

describing the OPIS strategy:

> The basic design of the investment strategy was premised upon the
> expectation that a highly leveraged position in Foreign Bank securities
> would provide Investor [defined as Peter Amato] with the opportunity
> for capital appreciation.  In order to maximize the utilization of
> foreign capital market credit facilities, Investor entered into a swap
> transaction.  The other participant in the swap was a foreign (non-
> U.S.) taxpayer, Hyde Street, LLC ("Limited Partner"), a limited
> liability company, that had a 99% limited partnership interest in a
> Cayman Islands limited partnership, Cayuga L.P. ("Foreign LP")
> which invested in Foreign Bank securities.  Investor further increased
> its investment position in Foreign Bank by making a direct purchase
> of Foreign Bank stock and options.

Compl. at Ex. C.  We agree with Defendants that given the level of involvement of

foreign entities, foreign stock, and options in Plaintiffs' OPIS strategy, Plaintiffs'

contention that the strategy has no "foreign element" is disingenuous.

     As we find there to be a "foreign element" to the parties' relationship, Jones

v. Sea Tow Services Freeport NY Inc., 30 F.3d 360 (2d Cir. 1994), is clearly

factually distinguishable from the case sub judice as we will detail.  In Jones,

United States citizens hired another United States citizen to rescue their yacht off

the cost of Long Island, New York.  Id. at 366.  Apart from the language in the

agreement between the parties which provided for arbitration in England under

English law, no other foreign element existed.  Id.  The Second Circuit Court of Appeals held that, absent a connection with England independent of the agreement itself, the relationship between the parties was insufficient to confer jurisdiction under the Convention.  Id.  In Jones, the Second Circuit reiterated the proposition that "any case concerning an agreement or award solely between U.S. citizens is excluded [from the Convention] *unless there is some important foreign element involved*, such as property located abroad, the performance of a contract in a foreign county [*sic*], or a similarly reasonable relation with one or more foreign states."  Id. at 365 (emphasis added) (quoting S. Rep. 702, 91st Cong., 2d Sess. App. at 6 (1970)).  The Second Circuit based its conclusion that the relationship between the parties was insufficient to confer jurisdiction under the Convention based upon the fact that the parties were United States citizens engaged in a purely domestic salvage dispute.  Accordingly, the relation with a foreign state required to invoke the Convention was lacking.

Although the court in Jones remanded the case after finding that neither the relationship between the parties, two United States citizens, nor their agreement had any reasonable relation with a foreign state, id. at 365-66, the facts of the instant case are readily distinguishable.  Here, the relationship between the parties involved property located abroad and envisaged performance abroad, as we

previously explained and in contrast to the <u>Jones</u> case.  Moreover, the commercial

relationship between the parties had a reasonable relation with a foreign country,

Germany, at least in part based upon the involvement of Plaintiffs' OPIS strategy

with loans from Deutsche Bank AG and trading in foreign markets.  Therefore, the

<u>Jones</u> case is factually distinguishable from the instant action.

At this juncture, we will address letters submitted to the Court by the parties

regarding recent case law.  In that regard, Plaintiffs rely upon a recent United

States District Court for the Western District of North Carolina case, <u>Green v.</u>

<u>KPMG LLP</u>, Civ. Nos. 3:05-CV-79-C, 3:05-CV-80-C, 3:05-CV-87-C, and 3:05-

CV-88-C (W.D.N.C. Feb. 27, 2006) (the "Green Order"), in support of their

Motion to Remand and Deutsche Bank Defendants analyze both the Green Order

as well as a recent United States District Court for New Jersey case, <u>Sullivan v.</u>

<u>KPMG, LLP</u>, Civ. No. 3:05-CV-817-SRC-TJB (D.N.J. Apr. 4, 2005) (the

"Sullivan Transcript").

In <u>Green</u>, which concerned a Foreign Leveraged Investment Program

("FLIP") tax shelter, the defendants removed each of the cases at issue to the

United States District Court for the Western District of North Carolina under the

Convention and the Edge Act, 12 U.S.C. § 632, on the theory that the plaintiffs'

claims were subject to an arbitration clause contained in several warrant contracts

(the "Warrants").  The Warrants containing the arbitration provision were between the plaintiffs and several non-party Cayman Island corporations.  In granting the plaintiffs' motion to remand, the court relied, among other things, upon KPMG's admission, pursuant to a deferred prosecution agreement with the United States Attorney's Office for the Southern District of New York that the money paid for the Warrants "in truth and in fact . . . constituted fees paid to KPMG, the Law Firm, the bank participant, the nominee foreign person, and other participants." Green Order at 4.  Based upon this admission by KPMG, the court concluded that the warrants were shams and declined to rely upon them as a basis to create federal subject matter jurisdiction under the Convention.  Id. at 7.

In Sullivan, which was relied upon in Green as further support for remand, the United States District Court for New Jersey granted the plaintiff's motion to remand where: (1) neither removing party was a signatory to the warrant that contained the arbitration clause; (2) neither removing party was involved in the performance of the terms of the warrant; and (3) the terms, interpretation, and execution of the warrant were not placed into dispute in the complaint.

A careful review of the above-referenced cases reveals that they are distinguishable from the instant action.  As accurately submitted by the Deutsche Bank Defendants, first, the arbitration clauses upon which KPMG sought to rely

were in warrants, documents intended to cover only a single transaction between the parties.  In contrast, the arbitration clause in this case is contained in Plaintiff Mr. Chebalo's Customer Agreement with DBSI, which covers the use of his securities account generally and all matters related to or arising out of that account agreement.  Plaintiff Mr. Chebalo used an account at DBSI to buy and sell Deutsche Bank securities which were only available in markets outside of the United States.  Such transactions are at the heart of Plaintiffs' claims.  This dispute falls under a valid and enforceable arbitration clause, as we will discuss in more detail below, and the agreement could affect the outcome of this case.  As noted by the court in <u>Sullivan</u>, "[a]s long as the defendant's assertion is not completely absurd or impossible, it is at least conceivable that the arbitration clause will impact the disposition of the case.  That is all that is required to meet the low bar of 'relates to.'" Sullivan Transcript at 30-31 (citing <u>Beiser</u>, 284 F.3d at 669).  Second, it would be improper for us to invalidate the Customer Agreement between DBSI and Plaintiff Mr. Chebalo, or discard the arbitration clause contained therein, based upon admissions made by KPMG in its deferred prosecution agreement, which binds only KPMG.

Accordingly, after having determined that the relationship out of which the Customer Agreement arose involved property located abroad, envisaged

42

performance in a foreign state, and otherwise related to a foreign state pursuant to

9 U.S.C. § 202, we will now ascertain whether this action relates to the arbitration

agreement and satisfies the "easy" removal standard under 9 U.S.C. § 205, which

differs from the general rule of strict construction of statutes conferring removal

jurisdiction.  See Beiser, 284 F.3d at 674.  The securities transactions that were an

integral part of the OPIS strategy were implemented through Plaintiffs' DBSI

brokerage accounts that are covered by the Customer Agreement.  Where, as here,

the Customer Agreement enabled Plaintiffs to implement the strategy at the crux of

the complaint, we find it to be not just "conceivable," but in fact likely that the

arbitration clause will impact the outcome of the case, thus satisfying the

jurisdictional inquiry at issue.  See id. at 669 ("whenever an arbitration agreement

falling under the Convention could conceivably affect the outcome of the

plaintiff's case, the agreement 'relates to' the plaintiff's suit").  As the relationship

out of which the Customer Agreement and thus the arbitration agreement arose,

falls squarely within the parameters of the Convention, and as the arbitration

agreement "relates to" the suit, we find that removal of this action is proper under 9

U.S.C. § 205.  See, e.g., Keeter v. KPMG LLP, No. 1:04-CV-3759-WSD, slip op.

at 4-5 (N.D. Ga. May 16, 2005), Hansen v. KPMG LLP, SA CV 04-010525-GLT

(MANx), slip op. at 2-4 (C.D. Cal. Mar. 29, 2005); Chew v. KPMG LLP, No.

3:04-CV-748BN, slip op. at 11-12 (S.D. Miss. Jan. 6, 2005); Wilson v. Deutsche Bank AG, No. 05-C-3474, slip op. at 8 (N.D. Ill. Nov. 30, 2005); Palmer Ventures, LLC v. KPMG LLP, No. 04-706-JJB-DLD, slip op. at 1-2 (M.D. La. Dec. 5, 2005).

### C.   Motions to Compel Arbitration and Stay These Proceedings

In their Motions, the Deutsche Bank Defendants, KPMG, and Presidio direct the Court's attention to a Customer Agreement with Deutsche Bank that includes an arbitration clause, which was signed by Plaintiff Mr. Chebalo.  DBSI has moved the Court to compel arbitration against Mr. Chebalo and to stay the claims of the other Plaintiffs against DBSI pending that arbitration.  Defendants Deutsche Bank and KPMG, although not signatories to the Customer Agreement, seek to compel arbitration with Mr. Chebalo and seek a stay with regard to all other Plaintiffs.  Defendant Presidio has moved for a stay based upon the potential DBS/Chebalo arbitration.

In response, Plaintiffs assert that New York law governs the Customer Agreement, as opposed to the Federal Arbitration Act.  Plaintiffs argue that under New York law, Defendants KPMG and the Deutsche Bank have no basis to compel arbitration.  Moreover, Plaintiffs contend that neither KPMG nor the Deutsche Bank can compel arbitration under the NASD.  Finally, Plaintiffs assert that the

claims between Mr. Chebalo and DBSI are not arbitrable as Mr. Chebalo's claims fall outside the parameters of the arbitration clause.

On or about June 29, 1998 and as noted, Plaintiff Mr. Chebalo executed a Customer Agreement as part of his participation in the OPIS transaction. (Rec. Doc. 18, Ex. A). As part of carrying out the investment strategy through Deutsche Bank accounts, Deutsche Bank required Mr. Chebalo to enter into the Customer Agreement "[i]n consideration of [Deutsche Bank] accepting one or more of the accounts [of the Plaintiff Mr. Chebalo] . . . and agreeing to act as brokers[.]" See id. Accordingly, when he opened his brokerage account, Mr. Chebalo signed a Customer Agreement, dated June 29, 1998. We find that the Customer Agreement was an integral part of the challenged investment transactions as Mr. Chebalo could not have engaged in the challenged transaction through Deutsche Bank without entering into the Agreement.

The Customer Agreement with Deutsche Bank includes an arbitration clause, which provides, in pertinent part, as follows:

14. Arbitration:

(i) Arbitration is final and binding on the parties.

(ii) The parties are waiving their right to seek remedies in court, including the right to jury trial.

. . .

45

> The UNDERSIGNED AGREES, and by carrying an Account of the Undersigned you agree, that . . . all controversies which may arise between us concerning any transaction of construction, performance, or breach of this or any other agreement between us, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration.  Any arbitration under this agreement shall be determined pursuant to the rules then in effect of the National Association of Securities Dealers, Inc. as the undersigned you may elect.  If the undersigned fails to make such election, then you may make such election.  The award of the arbitrators or the majority of them, shall be final, and judgment upon the award rendered may be entered in any court, state, or federal, having jurisdiction.

Id. ¶ 14.  Moreover, directly above Plaintiff Mr. Chebalo's signature, the Agreement states that, "An Arbitration clause is contained in this Agreement on page 3, item 14.  'Arbitration.'" Id. at 4.

We initially note that Defendants accurately submit that federal policy, as embodied in the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., strongly favors arbitration.  E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 289 (2002); Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983); Sandvik AB v. Advent Int'l Corp., 220 F.3d 99, 104-5 (3d Cir. 2000).  Pursuant to the FAA, a court must compel arbitration if it is satisfied that the claim at issue is within the scope of a valid, enforceable agreement to arbitrate.  See 9 U.S.C. §§ 3, 4; Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) ("By its own terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration

46

on issues as to which an arbitration agreement has been signed.").  Additionally,

the preference for arbitration is so strong that any doubts about the arbitrability of a

dispute should be resolved in favor of arbitration.  See Moses H. Cone Mem'l

Hosp., 460 U.S. at 25; Bannet v. Hankin, 331 F. Supp. 2d 354, 360 (E.D. Pa. 2004)

(internal citations omitted).  Moreover, the United States Supreme Court has held

that a presumption of arbitrability exists where a contract contains an arbitration

clause, and that an order to arbitrate should not be denied "unless it may be said

with positive assurance that the arbitration clause is not susceptible of an

interpretation that covers the asserted dispute."  Miron v. BDO Seidman, 342 F.

Supp. 2d 324, 328 (E.D. Pa. 2004) (quoting AT&T Tech., Inc. v. Communications

Workers of America, 475 U.S. 643, 650 (1986)); First Liberty Inv. Group v.

Nicholsberg, 145 F.3d 647, 653 (3d Cir. 1998).

At this juncture, we will address Plaintiffs' contention that the applicable

law is that of New York arbitration law, as opposed to the FAA, on the basis of the

Customer Agreement's express choice of New York law.  For the reasons that

follow, we find that the FAA, not New York law, governs.

We initially note that as submitted by the Deutsche Bank Defendants, in

Roadway Package Sys. v. Kayser, 257 F.3d 287, 296 (3d Cir. 2001), cert. denied,

534 U.S. 1020 (2001), the Third Circuit Court of Appeals established a bright-line

rule, "that a generic choice-of-law clause, standing alone, is insufficient to support

a finding that contracting parties intended to opt out of the FAA's default

standards."  Id. at 296.  In Roadway Package Systems, the Third Circuit made clear

that parties must expressly include a state's arbitration rules in a choice of law

clause if they intend to contract out of the FAA.  Id. at 296-97; see also Port Erie

Plastics, Inc. v. Uptown Nails LLC, 350 F. Supp. 2d 659, 664 (W.D. Pa.

2004)("the mere presence of a generic choice-of-law provision does not, by itself,

evidence an intent by the parties to incorporate into the Operating Agreement New

York rules of arbitration"); Wolsey, Ltd. v. Foodmaker, Inc., 144 F.3d 1205 (9th

Cir. 1998)(compelling arbitration under FAA rather than California law, despite

choice of law clause specifying California law).  In the case sub judice, the choice

of law provision in the Customer Agreement to which Plaintiffs direct the Court's

attention, does not appear in the arbitration provision of the Customer Agreement

and does not expressly incorporate New York's arbitration laws, nor does it opt out

of the FAA.  Therefore, we find that the FAA governs.

Plaintiffs ask the Court to disregard the FAA and apply New York law

because the "Governing Law" section of the Customer Agreement, ¶ 16, states that

"this Agreement and its enforcement shall be governed by the laws of the State of

New York."  Plaintiffs rely upon Smith Barney, Harris Upham & Co. v. Luckie, 85

N.Y.2d 193 (N.Y. 1995), which is not binding precedent upon this Court and which is of no import to this case, for the reasons that follow.

Luckie involved the application of a specific arbitration rule, N.Y. CPLR § 7502(b), which states in pertinent part that where arbitration has been demanded, "a party may assert the limitation [of time] as a bar to the arbitration on an application to the court." Id. at 197-98. Therefore, New York law permits a party to petition a court to stay arbitration on the ground that the arbitration demand was untimely. At the time that Luckie was decided, the year 1995, the law was unsettled under the FAA as to whether the court had the authority to address timeliness issues prior to compelling arbitration. The question before the court in Luckie was whether CPLR § 7502(b) "conflicts with the FAA on the question of the arbitrability of these Statute of Limitations disputes." Id. at 200. The Court of Appeals of New York ruled that a choice of law clause specifying that New York law would govern the "agreement and its enforcement" provided evidence that the parties intended for CPLR § 7502(b) to apply. Id. The court reasoned that since the parties did not specifically exclude New York's arbitration rules from their choice of law clause, they must have intended to include them. Id. at 202. The court further held that CPLR § 7502(b) did not conflict with the FAA and thus upheld the application of CPLR § 7502(b) in cases governed by the FAA. We are

49

accordingly in agreement with the Deutsche Bank Defendants that <u>Luckie</u> is of no import to the above-captioned case as it was limited to the application of CPLR § 7502(b), the judicial division of labor between the court and arbitrator with respect to timeliness issues.[12]  Therefore, as noted, we find that the FAA, not New York law, governs this case.

We now turn to the fact that district courts analyze two issues in determining whether a party must submit its claims to arbitration: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the arbitration agreement applies to the dispute at hand, <u>i.e.</u>, whether the dispute falls within the scope of the arbitration agreement.  <u>See</u> <u>John Hancock Mut. Life Ins. Co. v. Olick</u>, 151 F.3d 132, 137 (3d Cir. 1998); <u>In re Prudential Ins. Co. of Am. Sales Practice Litig.</u>, 133 F.3d 225, 228 (3d Cir. 1998).

We will initially consider the Deutsche Bank Defendants' Motion and ascertain whether a valid agreement to arbitrate exists between Plaintiff Mr.

---

[12] In addition, as submitted by the Deutsche Bank Defendants, subsequent authority has abrogated <u>Luckie</u> as explained by the Second Circuit Court of Appeals in <u>PaineWebber, Inc. v. Bybyk</u>, 81 F.3d 1193, 1200 (2d Cir. 1996); <u>see also</u> <u>Cowen & Co. v. Tecnoconsult Holdings Ltd.</u>, 1996 WL 391884 at *3 (S.D.N.Y. July 11, 1996)(explaining how <u>Bybyk</u> abrogated <u>Luckie</u>). Following <u>Bybyk</u>, the New York Court of Appeals reexamined this body of law and explained that, to the extent that <u>Luckie</u> has any vitality after <u>Mastrobuono v. Shearson Lehman Hutton</u>, 20 F.3d 713 (7th Cir. 1994), it stands for the narrow proposition that "[a] choice of law provision, which states that New York law shall govern both 'the agreement and its enforcement,' adopts as 'binding New York's rule that threshold Statute of Limitations questions are for the courts.'" <u>Diamond Waterproofing Systems, Inc. v. 55 Liberty Owners Corp.</u>, 4 N.Y.3d 247, 253 (N.Y. 2005)(quoting <u>Luckie</u>, 85 N.Y.2d at 201).

50

Chebalo and Deutsche Bank Defendants and whether the claims in this case fall within the scope of the arbitration agreement.  For the reasons that follow, we find that there is a valid agreement to arbitrate between these parties and that Mr. Chebalo's claims asserted in this action against the Deutsche Bank Defendants fall within the scope of the broad arbitration agreement that he executed with DBSI.

As previously noted, the arbitration agreement at issue is applicable to "all controversies which may arise between us concerning any transaction of construction, performance, or breach of this or any other agreement between us, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration."  (Rec. Doc. 18, Ex. A).  We are in agreement with the Deutsche Bank Defendants that such a broad provision should be interpreted accordingly, particularly given the fact that the provision must be interpreted in the context of a strong judicial presumption favoring arbitration so that "any doubt concerning the scope of arbitrable issues should be resolved in favor of arbitration . . ."  Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25.  Moreover, in similar circumstances, courts have found that equally broad arbitration clauses encompass all claims asserted by the plaintiff.  See, e.g., Chew, No. 3:04-CV-748BN, slip op. at 24 (noting that the broad language of an identical arbitration clause encompassed all disputes arising between the signatories); Galtney v. KPMG LLP, Case No. H-05-583 (S.D. Tex.

May 19, 2005), slip op. at 13-14 (noting that "any doubt is resolved in favor of arbitration" and finding that an identical arbitration clause encompassed plaintiff's claim for aiding and abetting breach of fiduciary duty relating to a similar tax strategy transaction); see also Millar v. Reliastar Life Ins. Co., 157 F. Supp. 2d 645, 647-49 (W.D.N.C. 2000)(finding that language of a similarly worded arbitration clause – which covered "any disputes or controversies that may arise between myself and [WSSI] or a registered representative of [WSSI] concerning any order or transaction, or the continuation, performance or breach of this or any other agreement between us, whether entered into before, on, or after the date this account is open" – "leaves nothing to the imagination and is clearly intended to be broad and inclusive in scope").  Accordingly, in light of the plain language of the broad arbitration provision in the Customer Agreement signed by Mr. Chebalo, we find that a valid agreement to arbitrate between the parties exists and that all of Mr. Chebalo's claims asserted against the Deutsche Bank Defendants fall within the scope of the arbitration agreement that he executed with DBSI.[13]  Moreover, the

_____

[13] Moreover, we note that Plaintiffs do not deny that Mr. Chebalo has a written agreement with DBSI that contains a broad arbitration clause encompassing the claims asserted in this action.  Plaintiffs, however, contend that Mr. Chebalo cannot be compelled to arbitrate because there is a class action pending against DBSI and the Customer Agreement contains an exception that does not require arbitration when the customer is a member of a putative class.  However, as accurately pointed out by Deutsche Bank Defendants, on December 12, 2005, approximately one and a half months after the complaint was filed in this action, Mr. Chebalo opted out of the class action.  (Rec. Doc. 33, Ex. 1)("Please be advised that Peter Amato, James Chebalo, and Leonard Ross have timely requested exclusion from the proposed class in Marvin Simon, et al. v. KPMG

plain language of the arbitration clause of the Customer Agreement requires, at a minimum, for Mr. Chebalo to submit to arbitration his claims against DBSI.

Deutsche Bank contends in its Motion that even though it was not a signatory to the Customer Agreement, it may nevertheless enforce the arbitration agreement because DBSI was acting as its agent at all relevant times. Deutsche Bank asserts that it is the parent of DBSI and can accordingly enforce the arbitration agreement between DBSI and Mr. Chebalo.

As accurately submitted by the Deutsche Bank Defendants, non-signatories to an arbitration agreement may compel arbitration where principles of agency apply. See Pritzker v. Merril Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1121-22 (3d Cir. 1993)("Because a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements."); E.I. Dupont De Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, 269 F.3d 187, 199-201 (3d Cir. 2001).

We are in agreement with Deutsche Bank that although it is itself not a signatory to the Customer Agreement, DBSI was acting as Deutsche Bank's agent in carrying out the transactions, which is a fact acknowledged by Mr. Chebalo. Consider, in that regard, that on June 25, 1998, before implementing the OPIS

---

LLP, et al., Civ. 05-cv-03189 DMC (D.N.J.)."). We therefore do not find the existence of the class action to bar enforcement of the Customer Agreement at issue.

strategy, Mr. Chebalo countersigned a letter sent by DBSI, Deutsche Bank's

subsidiary, identifying Deutsche Bank as DBSI's "parent company" and advising

Mr. Chebalo that DBSI was "act[ing] as agent" for its affiliates (including

Deutsche Bank) in connection with the financial transactions Mr. Chebalo was

executing in connection with his OPIS strategy.  (Rec. Doc. 27, Ex. C).  By

countersigning that June 25, 1998 letter agreement between DBSI and Mr.

Chebalo, Mr. Chebalo accordingly acknowledged the relationship between DBSI

and Deutsche Bank in connection with the services being delivered.  The letter

provides as follows:

> In consideration of our execution of the Transactions,[14] you hereby represent, warrant and acknowledge to us and to our affiliates *for which we act as agent* in connection with the Transactions (collectively, "Deutsche Bank") that:
>
> i.   Deutsche Bank [defined as DBSI and its affiliates] has had no involvement in, and accepts no responsibility for, the establishment or promotion of the Strategy; and
>
> ii.  Deutsche Bank makes no guarantee or representation whatsoever as to the expected performance or results of the Strategy or any Transaction (including the tax, financial or accounting consequences thereof), and you have not engaged in the Strategy or entered into the Transactions in reliance upon any such guarantee or representation.

---

[14] "Transactions" is defined as the Borrower's intent (i) "to borrow funds from . . . Deutsche Bank AG" and (ii) to "execute with or through us [DBSI], transactions involving shares of common stock of Deutsche Bank AG."  (Rec. Doc. 27, Ex. C).

54

iii.   [Mr. Chebalo] [has] been independently advised by [his] own legal counsel and will comply with all Internal Revenue Laws of the United States.

iv.   [Mr. Chebalo] [was] not approached by Deutsche Bank, to enter into the Strategy or any Transaction but, indeed, you were approached by Presidio Advisors, LLC to enter into the Strategy and the Transactions.

Id. (emphasis added).  As submitted by the Deutsche Bank Defendants, Mr. Chebalo used the DBSI account to implement the OPIS transaction, in part, by purchasing securities on the Frankfurt Stock Exchange and engaging in swaps.  In connection with such transactions, Mr. Chebalo countersigned a confirmation from Deutsche Bank, that provided in bold-face type capital letters that:

> **DEUTSCHE BANK AG IS NOT REGISTERED AS A BROKER-DEALER UNDER THE U.S. SECURITIES EXCHANGE ACT OF 1934.  DEUTSCHE BANK SECURITIES INC. HAS ACTED AS DEUTSCHE BANK AG'S AGENT IN CONNECTION WITH THIS TRANSACTION.**

Rec. Doc. 27, Ex. A.

As a non-signatory may invoke an arbitration clause under ordinary state law principles of agency, and DBSI was Deutsche Bank's agent, Deutsche Bank can compel Mr. Chebalo to arbitrate his claims.  Moreover, the claims against Deutsche Bank relate to services performed by DBSI as agent for Deutsche Bank and,

consequently, are founded upon and arise out of the same Customer Agreement.[15]

In addition, Plaintiffs allege in the complaint that Deutsche Bank and DBSI were

co-conspirators.  (Compl. ¶¶ 147-151).  We therefore find that Mr. Chebalo has

agreed to arbitrate any claims he may have against DBSI and acknowledged in

writing that DBSI was acting as Deutsche Bank's agent in carrying out various

transactions underlying the OPIS strategy.  Stated another way, Deutsche Bank

may properly enforce the arbitration agreement against Mr. Chebalo

notwithstanding the fact that it is not a signatory, as courts have recognized in

similar cases involving Deutsche Bank and other non-signatory defendants.  See

Chew, No. 3:04-CV-748BN, slip op. at 17 (non-signatory Deutsche Bank AG

could enforce similar agreement against plaintiff because signatory Deutsche Bank

Securities, Inc. was acting as its agent); Hansen, No. 04-010525-GLT (MANx),

slip op. at 5-7 (non-signatory Deutsche Bank AG could enforce similar agreement

against plaintiff because plaintiff alleged interdependent and concerted misconduct

between signatory Deutsche Bank Securities, Inc. and Deutsche Bank AG);

Galtney, No. H-05-583, slip op. at 15-17 (same).[16]

---

[15] As aptly submitted by the Deutsche Bank Defendants, throughout the complaint, Plaintiffs refer to Deutsche Bank and DBSI as "Deutsche Bank" and draw no substantive difference between the conduct of the two entities.  (Compl. ¶ 18).

[16] The Deutsche Bank Defendants accurately submit that Plaintiffs have not addressed the numerous cases cited by such Defendants establishing that Mr. Chebalo, as a signatory to the Customer Agreement, can be compelled to arbitrate against Deutsche Bank on agency grounds.

Therefore, the Court has found that Plaintiff Mr. Chebalo must submit to arbitration his claims against the Deutsche Bank Defendants pursuant to the broad arbitration clause contained in the Customer Agreement and agency principles.

We will now consider Defendant KPMG's Motion to Compel Arbitration and Stay All Proceedings, or, Alternatively, for an Extension of Time to Respond to Plaintiffs' Complaint.  In the Motion, KPMG argues that even as a non-signatory, it is entitled to enforce the arbitration agreement pursuant to principles of estoppel, which is one of the several theories arising out of the common law that provide a basis for non-signatories to enforce arbitration agreements.  See, e.g., Miron, 342 F. Supp. 2d at 332; Amkor Tech., Inc. v. Alcatel Bus. Sys., 278 F. Supp. 2d 519, 521 (E.D. Pa. 2003).

KPMG accurately submits that Third Circuit case law instructs that equitable estoppel principles allow a non-signatory to compel arbitration where there is a close relationship between the entities involved and where the claims against the non-signatory are closely intertwined with the arbitration agreement:

> [A]lternative estoppel . . . will bind a signatory to arbitrate at a non-signatory's insistence where there is an obvious and close nexus between the non-signatories and the contract or the contracting

---

As we have determined that Deutsche Bank may properly enforce the arbitration agreement against Mr. Chebalo notwithstanding the fact that it is a non-signatory on the basis of agency principles, we need not address the Deutsche Bank Defendants' further argument concerning estoppel.

> parties. . . The two-part test for alternative estoppel requires a court to determine whether there is a close relationship between the entities involved, and examine the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract. . . To satisfy the second part of the test, the non-signatory seeking enforcement of an arbitration agreement must show that the claims against them are intimately founded in and intertwined with the underlying obligations of the contract to which they were not a party.

Miron, 342 F. Supp. 2d at 333 (internal citations omitted); see also e.g., E.I. DuPont Nemours and Co., 269 F.3d at 199.

KPMG argues in the Motion that Plaintiffs' allegations equitably estop Plaintiff Mr. Chebalo from avoiding arbitration with KPMG as the complaint alleges a "close relationship between the entities involved" and because the claims asserted against KPMG are "intimately founded in and intertwined with the underlying obligations of the contract."  (KPMG Br. Supp. Mot. Compel Arb. at 8-10).

At oral argument held before the Court on May 24, 2006, Plaintiffs' counsel directed the Court's attention to a Deferred Prosecution Agreement ("DPA") entered into by Defendant KPMG with the Government arising from KPMG's FLIP, OPIS, Bond Linked Issue Premium Structure ("BLIPS"), and Short Option Strategy ("SOS") and entered into by KPMG to cooperate with the Government's investigation into criminal wrongdoing associated with the development, promotion, and implementation of tax shelters.  (Oral Argument, May 24, 2006,

Pls' Ex. 1).  The DPA is subdivided into the following sections: "Statement of

Facts" ("SOF"); "The Fraudulent Tax Shelter Activities;" "Steps Taken to Avoid

IRS Scrutiny of the Tax Shelters;" "KPMG's Responses to IRS and Senate

Investigations of its Fraudulent Tax Shelter Activities," and "KPMG's

Cooperation."  In the DPA, KPMG stipulated to a  SOF.  In the SOF, KPMG

admits that "[f]rom 1996 until 2002, KPMG, through its tax partners, it assisted

high net worth United States citizens to evade United States individual income

taxes on billions of dollars in capital gain and ordinary income by developing,

promoting and implementing unregistered and fraudulent tax shelters."  Id. ¶ 2.  In

the DPA, KPMG details the unlawful and fraudulent conduct performed at the

hands of a number of KPMG tax partners, KPMG tax management, and other

personnel.  In the "Fraudulent Tax Shelter Activities" portion of the DPA, KPMG

admits that its tax partners helped design or sell tax shelters to high net worth

United States citizens during the period in question, as noted.  With regard to

OPIS, the tax shelter at issue in this case, KPMG admits that it was marketed and

sold by KPMG between 1998 and 2000 to at least 170 high net worth individual

clients, it generated at least $2.3 billion in bogus tax losses, and KPMG's gross

fees from OPIS transactions were at least $28 billion.  Id. ¶ 6.

     Moreover, and as raised by Plaintiffs' counsel before the Court on May 24,

2006, KPMG admits in the DPA that OPIS opinions signed  by KPMG tax partners

and the representations drafted by KPMG tax partners and knowingly adopted by

the high net worth individual clients, falsely stated that:

> (a) the client requested KPMG's opinion 'regarding the U.S. federal
> income tax consequences of certain investment portfolio transactions,'
> when in truth and in fact there were tax shelter transactions designed
> to generate bogus tax losses; (b) the 'investment strategy' was based
> on the expectation that a leveraged position in the foreign bank
> securities would provide the 'investor' with the opportunity for capital
> appreciation, when in truth and in fact the strategy was based on the
> expected bogus tax benefits to be generated; and (c) certain money
> was paid as part of an investment (i.e., for a warrant or a swap), when
> in truth and in fact the money constituted fees due to promoters and
> other facilitators of the transaction.  All of these opinion letters were
> substantially identical, save for the names of the clients and entities
> involved, the dates, and the dollar amounts involved in the
> transactions.

Id. ¶ 9.

After a careful review of the DPA and applicable case law, we are in

agreement with Plaintiffs' compelling argument that KPMG cannot avail itself of

the equitable doctrine of estoppel in the case sub judice as the DPA reflects in

particular detail that KPMG lacks clean hands in transactions underlying the

above-captioned case, specifically OPIS transactions.  As aptly stated by the

United States District Court for the Southern District of Texas in Galtney, "[t]he

lynchpin for equitable estoppel is equity and the point of applying it to compel

arbitration is to prevent a situation that would fly in the face of fairness."  Galtney,

No. H-05-583, slip op. at 12 (citing Hill v. Gen. Elec. Power Sys., Inc., 282 F.3d 343, 349 (5th Cir. 2002)).  Counsel for KPMG conceded at oral argument that the language of the DPA specifically refers to certain OPIS strategies; however, notwithstanding that fact, KPMG's counsel asserted that the DPA failed to refer directly to the Plaintiffs in this action.  We find it unduly onerous and completely unnecessary for the DPA to list the name of each and every client who participated in transactions with KPMG that ultimately resulted in the filing of the DPA at issue.  In fact, as noted, the plain language of the DPA directly speaks to that issue and states that "All of these opinion letters were substantially identical, save for the names of the clients and entities involved, the dates, and the dollar amounts involved in the transaction."  Id. ¶ 9.  The DPA specifically includes OPIS transactions, which form the underlying basis for the instant suit.  While we are cognizant of KPMG's strenuous argument that the Court has discretion to enforce the arbitration agreement against a non-signatory based upon principles of equitable estoppel, it would be entirely inequitable and "fly in the face of fairness" to permit KPMG to avail itself of such doctrine when it lacks clean hands, as evidenced by its entry into the aforereferenced DPA.[17]  We will therefore deny KPMG's Motion to Compel Arbitration to the extent that KPMG is not entitled to

---

[17] Moreover, we find the cases relied upon by KPMG to be factually distinguishable from the instant case as they did not involve KPMG's entry into a DPA with the Government.

enforce the arbitration agreement; however, as will be discussed in more detail below, KPMG's Motion is granted to the extent that the proceeding will be stayed pending resolution of the arbitration between Plaintiff Mr. Chebalo and the Deutsche Bank Defendants.

Presidio has filed a Motion to Stay Proceedings Pending Arbitration, or Alternatively, for Additional Time to Respond to Complaint in which it argues that this Court should stay this case as to all parties if we grant the Deutsche Bank Defendants' Motion to Compel Arbitration. "Because of the strong federal interest favoring arbitration, Presidio submits that should an arbitration involving Deutsche Bank and certain Plaintiffs be ordered, this action should be stayed against all other parties." (Presidio Br. Supp. Mot. Stay at 2-3). In the Motion, Defendant Presidio argues that Plaintiffs' claims revolve around allegations that all Defendants joined in a conspiracy to defraud Plaintiffs by making a particular investment available to Plaintiffs. Presidio asserts that if the Court and jury will be required to make findings on numerous issues of fact and law that will also be the subject of the arbitration between Plaintiffs and Deutsche Bank Defendants, inherent risks of inconsistent rulings and inefficiencies will occur, if the matters proceed simultaneously. Presidio additionally asserts that the imposition of a stay will present no significant prejudice to Plaintiffs as they waited several years to bring

this lawsuit arising out of investments that occurred in 1998. "In short, given the poverty of the allegations of causation and damages, there is no basis to conclude that a stay pending arbitration would unfairly prejudice Plaintiffs in any way." Id. at 6. Moreover, we note that the Deutsche Bank Defendants also maintain that the Court should stay the proceedings in their entirety pending arbitration in the interest of judicial efficiency and based upon the Court's inherent authority to grant a stay in order to conserve judicial resources. (Deutsche Bank Defs.' Br. Supp. Mot. Compel Arbitration at 17-21).

Before this Court can decide the issue of whether the nonarbitrable claims should be stayed pending final resolution of the arbitrable claims, we must ascertain whether the nonarbitrable claims should be severed and remanded to state court. Plaintiffs argue that if the Court determines that it has subject matter jurisdiction over Mr. Chebalo's claims against Deutsche Bank, it should nevertheless exercise its discretion to remand the remaining claims of the other Plaintiffs.

A district court may exercise supplemental jurisdiction over claims for which it has no original jurisdiction if those claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . ." 28 U.S.C. § 1367(a); see Growth Horizon, Inc. v. Delaware

County, Pa., 983 F.2d 1277, 1285 n.14 (3d Cir. 1993)(section 1367(a) "states that

federal courts shall exercise supplemental jurisdiction over pendent claims arising

out of the same case or controversy").  Moreover, this Court has held that

supplemental jurisdiction applies not only to claims brought by a single plaintiff,

but also where different plaintiffs' claims "derive from a 'common nucleus of

operative fact' and are such that a plaintiff 'would ordinarily be expected to try

them in one judicial proceeding.'" Arnold v. Kimberly Quality Care Nursing Serv.,

762 F. Supp. 1182, 1186 (M.D. Pa. 1991)(internal citations omitted).

Under the facts of this case, we find that the arbitrable claims over which we

have original jurisdiction and the nonarbitrable claims "form part of the same case

or controversy."  See Chew, 3:04-CV-748BN, slip op. at 25.  In addition, the

complaint makes clear that Plaintiffs' claims all derive from a "common nucleus of

operative fact."  (Compl. ¶¶ 25, 47, 101).  Accordingly, the Court will exercise

supplemental jurisdiction over the nonarbitrable claims and no claims in the case

sub judice will be severed and remanded to state court.[18]

---

[18] As the United States District Court for the Southern District of Mississippi aptly noted in Chew, an argument can be made that original federal jurisdiction exists over the nonarbitrable claims because they are asserted in a cause of action which contains arbitrable claims under the FAA, and in particular under the Convention.  A ruling on such issue is not made however in this Memorandum and Order because, to the extent that original jurisdiction does not exist for those claims under the FAA, the Court will exercise supplemental jurisdiction over the claims under 28 U.S.C. § 1367(a).  3:04-CV-748BN, slip op. at 25-26 n.14.

Regarding the Defendants' request for a stay of the nonarbitrable claims, the

Deutsche Bank Defendants rely upon 9 U.S.C. § 3, which states in relevant part:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . .

The Third Circuit Court of Appeals has instructed that "[a] party to a valid and

enforceable arbitration agreement is entitled to a stay of federal court proceedings

pending arbitration as well as an order compelling such arbitration." Alexander v.

Anthony Int'l L.P., 341 F.3d 256, 263 (3d Cir. 2003)(citing Seus v. John Nuveen &

Co., Inc., 146 F.3d 175, 179 (3d Cir. 1998)); see also Shaffer v. Graybill, 68 Fed.

Appx. 374, 376 (3d Cir. 2003)("Under the FAA, a court, on application of one of

the parties to an agreement to arbitrate, must stay a judicial action commenced in

that court which is the subject of an arbitration clause or, in the alternative, must

dismiss any arbitrable claims.").  Accordingly, on the basis of the plain language of

9 U.S.C. § 3 and applicable case law, DBSI, as a signatory to the Customer

Agreement, is clearly entitled to a stay of all nonarbitrable claims against it in this

action.

Regarding the right to a stay requested by Deutsche Bank and Presidio, as

non-signatories to the Customer Agreement, the Court has discretion to stay proceedings against parties and non-parties to an arbitration when the resolution of the civil proceeding would involve a common question of law or fact within the scope of the arbitration agreement.  Consider, for example, that in <u>Berkery v. Cross Country Bank</u>, 256 F. Supp. 2d 359 (E.D. Pa. 2003), the court stayed proceedings against several non-arbitrating parties pending arbitration between the plaintiff and the arbitrating defendant.  <u>Id.</u> at 370.  In <u>Berkery</u>, the court noted that "[t]he Third Circuit has found decisions to stay arbitration proper in circumstances where non-parties to an arbitration agreement 'have related and congruent interests with [those of the parties who were also] principals to the litigation."  <u>Id.</u> at 370 n.11 (citing <u>Barrowclough v. Kider, Peabody & Co.</u>, 725 F.2d 923, 938 (3d Cir. 1985), <u>overruled on other grounds</u>, <u>Pritzker v. Merrill Lynch, Pierce, Fennder & Smith</u>, 7 F.3d 1110 (3d Cir. 1993)); <u>see</u> <u>also</u> <u>Cost Brothers, Inc. v. The Travelers Indem. Co.</u>, 760 F.2d 58, 60 (3d Cir. 1985)("[T]he decision whether to grant a stay in this case is committed to the district court's discretion, since it is a matter of the court's inherent power to conserve judicial resources by controlling its own docket.").

As accurately submitted by Defendants, the claims asserted in the complaint are brought by Plaintiffs jointly and are grounded in identical facts and legal theories.  Moreover, Plaintiffs' twenty causes of action against six Defendants

revolve around Plaintiffs' allegations that all of the Defendants joined in a conspiracy to defraud Plaintiffs by making a particular investment available to Plaintiffs.  See, e.g., Compl. ¶¶ 146-151.  Therefore, we find that simultaneous prosecution of the claims in arbitration, with respect to Plaintiff Mr. Chebalo, and this litigation with respect to the other Plaintiffs, would clearly be a waste of judicial resources.  In addition, given the interdependence of Plaintiffs' claims, simultaneous litigation of such claims in separate forums would likely lead to a duplication of effort, as well as the risk of inconsistent decisions and inefficiencies. As aptly submitted by the Deutsche Bank Defendants and Presidio, for such reasons, numerous other district courts have granted discretionary stays in analogous or exact situations in litigation involving plaintiffs' participation in an investment strategy similar to the investment strategy at issue in this case.  See, e.g., GM Johnson Family Ltd. P'ship v. Deutsche Bank, et al., Civ. No. 03-5240 (W.D. Ark. Mar. 16, 2004)(staying plaintiffs' claims against Deutsche Bank's co-defendant pending the arbitration of the plaintiffs' claims against Deutsche Bank due to existence of common issues); Whipple Family Ltd. P'ship v. Deutsche Bank, et al., Civil No. 03-6115 (W.D. Ark. Mar. 16, 2004); Reddam v. KPMG, et al., Civil No. SA CV 04-1227-GLT (MANx) (C.D. Cal. Dec. 14, 2004); Galtney, Case No. H-05-583, slip op. at 17-18; Keeter, No. 1:04-CV-3759-WSD, slip op. at

17-19; <u>Chew</u>, 3:04-CV-748BN, slip op. at 27 (finding that "the nonarbitrable claims asserted against [Deutsche Bank AG and Deutsche Bank Securities, Inc.] should be stayed"); <u>Heller v. Deutsche Bank AG</u>, 2005 WL 665052 at *6 (E.D. Pa. Mar. 17, 2005)(noting that courts "typically grant stays when there are both arbitrable and non-arbitrable claims in the same action and significant overlap exists between the parties and issues"); <u>Miron</u>, 342 F. Supp. 2d at 334 ("[T]he FAA's requirement that a court stay 'the trial of the action' suggests that the proceedings must be stayed in their entirety, even when the action encompasses both arbitrable and non-arbitrable claims.").  In several of the aforereferenced cases, the courts granted Presidio's Motions to Stay Pending Arbitration, finding that the civil proceedings against Presidio would involve "common questions of act that are within the scope of the arbitration agreement."  We find the reasoning contained in these cases to be compelling.

Although Plaintiffs briefly assert that there is no appropriate reason to stay these proceedings, we find that they have not established that they would be prejudiced by a stay pending resolution of the arbitration between the Deutsche Bank Defendants and Mr. Chebalo.  We are in agreement with Presidio that the imposition of a stay will present no significant prejudice to Plaintiffs as they waited several years to bring this lawsuit arising out of investments that occurred

in 1998.  In addition and as previously noted, because Plaintiffs allege concerted

conduct and a joint conspiracy to defraud, it would be inefficient and risk

inconsistent findings and rulings to permit this case to proceed against the non-

arbitrable Defendants after compelling arbitration against the Deutsche Bank

Defendants.  Accordingly, this case is stayed pending resolution of the arbitration.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.  Sidley Austin's Motion to Dismiss Plaintiffs' Complaint pursuant to

     Fed.R.Civ.P. 12(b)(6) (doc. 9) is granted in part and denied in part to

     the following extent:

     A.  Plaintiffs' claims for the recoupment of interest paid to the IRS

           in all applicable counts of their complaint are dismissed.

     B.  Plaintiffs' aiding and abetting fraud claims in all applicable

           counts of their complaint are dismissed.

     C.  Sidley Austin's Motion is denied in all other respects.

2.  Plaintiffs' Motion to Remand for Lack of Subject Matter Jurisdiction

     (doc. 23) is DENIED.

3.  Defendant KPMG's Motion to Compel Arbitration and Stay All

     Proceedings, or, Alternatively, for an Extension of Time to Respond

     to Plaintiffs' Complaint (doc. 7) is granted in part and denied in part

to the following extent:

 A. KPMG's Motion is granted to the extent that all further proceedings in this case are STAYED against KPMG pending the outcome of the arbitration between Plaintiff Mr. Chebalo and Defendants Deutsche Bank AG and Deutsche Bank Securities, Inc., in accordance with the arbitration clause contained in the Customer Agreement.

 B. The Motion is denied in all other respects.

4. Defendant Deutsche Bank Defendants' Motion to Compel Arbitration and Stay These Proceedings, or, Alternatively, for an Extension of Time to Respond to Plaintiffs' Complaint (doc. 10) is granted in part and denied in part to the following extent:

 A. Deutsche Bank Defendants' Motion is granted to the extent that Plaintiff Mr. Chebalo shall submit his claims against Deutsche Bank AG and Deutsche Bank Securities, Inc. to arbitration in accordance with the arbitration clause contained in the Customer Agreement. All further proceedings in this case are STAYED pending the outcome of the arbitration between Plaintiff Mr. Chebalo and Defendants Deutsche Bank AG and

Deutsche Bank Securities, Inc.

    B.    Deutsche Bank Defendants' Motion is denied in all other

respects.

5.    Presidio Defendants' Motion to Stay Proceedings Pending Arbitration,

or, Alternatively, for Additional Time to Respond to Complaint (doc.

8) is granted in part and denied in part to the following extent:

    A.    Presidio's Motion is granted to the extent that all further

proceedings in this case are STAYED against Presidio pending

the outcome of the arbitration between Plaintiff Mr. Chebalo

and Defendants Deutsche Bank AG and Deutsche Bank

Securities, Inc., in accordance with the arbitration clause

contained in the Customer Agreement.

    B.    Presidio's Motion is denied in all other respects.

6.    Based on the foregoing, Plaintiff Mr. Chebalo must submit to

arbitration his claims against Defendants Deutsche Bank AG and

Deutsche Bank Securities, Inc.  The arbitration must be in accordance

with the applicable provisions of the Customer Agreement signed by

Plaintiff Mr. Chebalo.

7.    All further proceedings in this case are STAYED against all

Defendants pending the completion of the arbitration process between Plaintiff Mr. Chebalo and Defendants Deutsche Bank AG and Deutsche Bank Securities, Inc., in accordance with the arbitration clause contained in the Customer Agreement.

8.      The remaining Plaintiffs are not required to submit to arbitration any of their claims against any of the Defendants.

9.      The Court will schedule a telephonic status conference for December 4, 2006, at 9:30 a.m., which will be initiated by Plaintiffs' counsel, advising the Court on the progress of the arbitration procedure.  The Chambers' telephone number is (570) 601-1497.  The parties are encouraged to complete the arbitration process by that date.

s/ John E. Jones III
John E. Jones III
United States District Judge